cups and glasses, or silverware. For maximum efficiency, avoid covering the center hole in the drawer rack. Use only dishwashing detergent products. Do not use soap or laundry detergents, as they will cause the dishwasher to overflow.

You can save power and reduce your electric bill by waiting to run your dishwasher until you have a full load. However, do not leave dirty dishes in the dishwasher for a long period of time.

### In-Unit Washers and Dryers
Check and clean the lint trap on your dryer before each use and do not dry plastic items. Do not store anything on top of or near the dryer and do not obstruct dryer vents. Inspect your washer and dryer hoses and vents on a regular basis and report any maintenance issues to management. When using your washer or dryer, follow manufacturer's requirements on load limitations.

### MOVING OUT
When it's time for you to move out, we have a few simple requirements:

* You must fulfill all the terms and conditions of your lease and leave owing the community no money

* You must give us formal written notice, within the time frame stated in your lease, of your intention to terminate your lease. You must vacate and remove all of your property on or before the termination date

* You must leave your apartment in the same condition as when you moved in, taking normal wear and tear into account. For example, normal wear would include such things as traffic wear across the carpet, but not cigarette burns or stains

* If you make prior arrangements through the management office, a walk through may be requested at the time you vacate your apartment. If no prior arrangements are made, an authorized management representative will conduct a walk through of your vacant apartment. The move-out checklist, available at your community should be completed and signed by both you and the staff member

* You must give a complete forwarding address to us.

* You are not considered officially moved out until all keys are turned in to the office

* When you vacate your apartment, any personal property left in your apartment will be considered abandoned and may be disposed of, without liability to us, subject to applicable laws.

* If you have added an additional telephone line(s) to your apartment, you will be responsible for all fees to return the telephone service in the apartment to its status at the time you moved in.

### Rental Security Deposits; Standard Cleaning and Repair Charges
Your rental security deposit is a good faith deposit for your fulfillment of your lease and is a contingency against any damages to your apartment or the community caused by you, your family, or your guests. The security deposit cannot be applied to your last month's rent.

### ADDITIONAL COMMUNITY POLICIES
You must abide by all of your Community's policies. Please check with your management office to see if there are additional community policies in effect at your Community.

### CHANGES TO THIS HANDBOOK
These policies may be modified from time to time without notice. Violations of these policies will constitute a breach of your lease. If there is a conflict between these policies and the lease, the lease shall govern.

### SEVERABILITY
If any provision of this handbook were determined to be invalid or unenforceable, such determination shall not affect, impair or invalidate any other provisions of this handbook.

© Equity Residential 2003   All Rights Reserved

FINAL STATEMENT

**Taunton Municipal Light Plant**
P.O. 870, Taunton, MA 02780-0870

TO: Meredith A Caldwell

BILLING ADDRESS:    120 Dean Street 101B / Taunton MA 02780

**508-824-5844**

**508-824-6976**

ACCOUNT NUMBER: 20050376
INVOICE DATE:    08/22/2003
DUE BEFORE:    09/22/2003

AMOUNT DUE    115.41
If paid by 09/01/2003    114.10

This statement covers your final billing for the services rendered to you at the address shown on this portion of the invoice.

## ACCOUNT SUMMARY

| | |
|---|---|
| Previous Balance | 89.25 |
| Discounts applied | 0.00 |
| Current charges | 26.16 |
| Present Balance | 115.41 |

Electric
meter number
000044225S
rate
01
previous read
95,492
present read
95,760
billing multiplier
1
service period
08/06/2003
to
08/15/2003

### ELECTRIC SERVICE CONTRACT

service address - ( 03 ) 819 County St 69C Taunton MA

| Energy Charges | |
|---|---|
| Ppca( 268.0 KWH X 0.02100 ) | 21.19 |
| Pasny( 268.0 KWH X 0.00248- ) | 5.63 |
| Total | -0.66 |
| | 26.16 |

*Paid 8/23/03*

| Month | Consumption (Kwh/Day) | Demand |
|---|---|---|
| Aug 02 | 27 | |
| Sep 02 | 19 | |
| Oct 02 | 12 | |
| Nov 02 | 12 | |
| Dec 02 | 12 | |
| Jan 03 | 14 | |
| Feb 03 | 14 | |
| Mar 03 | 14 | |
| Apr 03 | 14 | |
| May 03 | 15 | |
| Jun 03 | 24 | |
| Jul 03 | 27 | |
| Aug 03 | 27 | |

| billing year | this year | last year |
|---|---|---|
| billing days | 10 | 33 |
| kWh use | 268.0 | 941.0 |
| kWh/Day | 26.8 | 28.5 |
| demand | 0.0 | 0.0 |

8000038562


EXHIBIT
B

TMLP

MONTHLY STATEMENT

Taunton Municipal Light Plant
P.O. 870, Taunton, MA 02780-0870

TO:
BILLING ADDRESS:

Meredith A Caldwell
120 Dean Street 101B  Taunton Ma 02780

508-824-5844

508-824-6976

ACCOUNT NUMBER: 20050376
INVOICE DATE: 09/16/2003
DUE DATE: 10/16/2003

AMOUNT DUE: 63.34

If paid by 09/26/2003    60.11

## ACCOUNT SUMMARY

| Previous Balance | | |
|---|---|---|
| Payments | | 115.41 |
| 08/27/2003 | | |
| Discounts | | 115.41cr |
| Current Charges | | 1.31cr |
| Present Balance | | 64.65 |
| | | 63.34 |

## ELECTRIC SERVICE CONTRACT

service address: ( 05 ) 120 Dean St B101 Taunton Ma

Service Period: From 08/16/2003, To 09/08/2003



meter number
000044530B

rate
11

previous read
34,851

present read
35,541

billing multiplier
1

Energy Charges
| Ppca( 690.0 Kwh X 0.02100 ) | 54.17 |
|---|---|
| Pasny( 690.0 Kwh X 0.00581- ) | 14.49 |
| Total | -4.01 |
| | 64.65 |

KWH/PERDAY

SEP OCT NOV DEC JAN FEB MAR APR MAY JUN JUL AUG SEP

29

| | this year | last year |
|---|---|---|
| billing year | | |
| billing days | 24 | 0 |
| kWh use | 690.0 | 0.0 |
| kWh per day | 28.8 | 0.0 |

Please note: We are now back to our regular office hours Monday through Friday
7:30 - 4:30.

80000789259

7P6



M O N T H L Y   S T A T E M E N T

*Page 1 of 1*

Taunton Municipal Light Plant
P.O. 870, Taunton, MA 02780-0870

TO:        Meredith A Caldwell
BILLING ADDRESS:   120 Dean Street 101B  Taunton Ma 02780

508-824-5844

508-824-6976

| | |
|---|---|
| ACCOUNT NUMBER: | 20050376 |
| INVOICE DATE: | 10/15/2003 |
| DUE DATE: | 11/14/2003 |

**AMOUNT DUE:** 81.14

If paid by 10/25/2003    77.08

## ACCOUNT SUMMARY

| | | |
|---|---|---|
| Previous Balance | | 63.34 |
| Payments | | |
| 09/23/2003 | | 60.11cr |
| Discounts | | 3.23cr |
| Current Charges | | 81.14 |
| Present Balance | | 81.14 |

## ELECTRIC SERVICE CONTRACT

service address: ( 05 ) 120 Dean St B101 Taunton Ma

Service Period: From 09/09/2003, To 10/08/2003

| | |
|---|---|
| Energy Charges | 65.02 |
| Ppca( 823.0 Kwh X 0.02100 ) | 17.28 |
| Pasny( 823.0 Kwh X 0.00141- ) | -1.16 |
| **Total** | **81.14** |

meter number
0000445308

29

rate
11

previous read
35,541

present read
36,364

billing multiplier
1

KWH/PERDAY

OCT NOV DEC JAN FEB MAR APR MAY JUN JUL AUG SEP OCT

| billing year | this year | last year |
|---|---|---|
| billing days | 30 | 0 |
| kWh use | 823.0 | 0.0 |
| kWh per day | 27.4 | 0.0 |
| Demand | 0.0 | 0.0 |

Please note: We are now back to our regular office hours Monday through Friday
7:30 - 4:30.

80000820748





# MONTHLY STATEMENT

*Page 1 of 1*

**Taunton Municipal Light Plant**
P.O. 870, Taunton, MA 02780-0870

**TO:**
**BILLING ADDRESS:**

**Meredith A Caldwell**
120 Dean Street 101B Taunton Ma 02780

Serving a Public Power Community

*Emergency?*     **508-824-5844**
*Questions concerning your TMLP bill?*
         **508-824-6976**

| | | |
|---|---|---|
| ACCOUNT NUMBER: | 20050376 | |
| INVOICE DATE: | 11/18/2003 | **AMOUNT DUE:** 122.79 |
| DUE DATE: | 12/18/2003 | If paid by 11/28/2003  116.65 |

## ACCOUNT SUMMARY

| | | |
|---|---|---|
| Previous Balance | | 81.14 |
| Payments | | |
| 10/23/2003 | | 77.08cr |
| Discounts | | 4.06cr |
| Current Charges | | 122.79 |
| Present Balance | | **122.79** |

## ELECTRIC SERVICE CONTRACT

service address: ( 05 ) 120 Dean St B101 Taunton Ma

Service Period: From 10/09/2003, To 11/05/2003

| | |
|---|---|
| Energy Charges | 96.96 |
| Ppca( 1,276.0 Kwh X 0.02100 ) | 26.80 |
| Pasny( 1,276.0 Kwh X 0.00076- ) | -0.97 |
| **Total** | **122.79** |

meter number
000044530B

rate
11

previous read
36,364

present read
37,640

billing multiplier
1

46

**KWH/PERDAY**

NOV DEC JAN FEB MAR APR MAY JUN JUL AUG SEP OCT NOV

| | this year | last year |
|---|---|---|
| billing year | | |
| billing days | 28 | 0 |
| kWh use | 1,276.0 | 0.0 |
| kWh per day | 45.6 | 0.0 |
| Demand | 0.0 | 0.0 |

Please note: We are now back to our regular office hours Monday through Friday 7:30 - 4:30.

80000852183

# TMLP  MONTHLY STATEMENT

Page 1 of 1

P.O. 870, Taunton, MA  02780-0870

BILLING ADDRESS:  120 Dean Street 101B  Taunton Ma 02780

Serving a Public Power Community

**Emergency?**  **508-824-5844**
Questions concerning your TMLP bill?
**508-824-6976**

Reminder...the balance as shown on this statement is past due. If payment has been made please accept our thanks and disregard this notice.

| | |
|---|---|
| ACCOUNT NUMBER: | 20050376 |
| INVOICE DATE: | 01/13/2004 |
| DUE DATE: | 02/12/2004 |

| | |
|---|---|
| **AMOUNT DUE:** | **400.23** |
| If paid by 01/23/2004 | 389.98 |

### ACCOUNT SUMMARY

| | |
|---|---|
| Previous Balance | 195.30 |
| Current Charges | 204.93 |
| Present Balance | 400.23 |

### ELECTRIC SERVICE CONTRACT

service address: ( 05 ) 120 Dean St B101 Taunton Ma

Service Period: From 12/09/2003, To 01/08/2004

| | | |
|---|---|---|
| Energy Charges | | |
| Ppca( 2,225.0 Kwh X 0.02100 ) | 163.87 | |
| Pasny( 2,225.0 Kwh X 0.00255- ) | 46.73 | |
| | -5.67 | |
| **Total** | | **204.93** |

meter number
000044530B

rate
11

previous read
39,762

present read
41,987

billing multiplier
1

| billing year | this year | last year |
|---|---|---|
| billing days | 31 | 0 |
| kWh use | 2,225.0 | 0.0 |
| kWh per day | 71.8 | 0.0 |
| Demand | 0.0 | 0.0 |

-003531

Please note: We are now back to our regular office hours Monday through Friday 7:30 - 4:30.

80000921304
80000921304

## TMLP

Please return this portion with a check or money order made payable to

If address has changed, please check here and correct the information below.

20050376

400.23

If paid by 01/23/2004   389.98

Meredith A Caldwell
120 Dean Street 101B
Taunton, Ma  02780-2745

**TMLP**

Meredith A Caldwell

P.O. 870, Taunton, MA 02780-0870    BILLING ADDRESS:    22-2 Meadow Lane / Bridgewater MA 02324

Serving a Public Power Community

**Emergency?**    **508-824-5844**
*Questions concerning your TMLP bill?*
                **508-824-6976**

This statement covers your final billing for the services rendered to you at the address shown on this portion of the invoice.

| ACCOUNT NUMBER: | 20050376 | AMOUNT DUE | 529.98 |
|---|---|---|---|
| INVOICE DATE: | 02/10/2004 | If paid by 02/20/2004 | |
| DUE BEFORE: | 03/11/2004 | | 513.73 |

### ACCOUNT SUMMARY

| | |
|---|---|
| Previous Balance | 400.23 |
| Payments | |
| 01/27/2004 | -195.30 |
| Discounts applied | 0.00 |
| Current charges | 325.05 |
| Present Balance | 529.98 |

Electric
meter number
000044530B
rate
11
previous read
41,987
present read
45,522
billing multiplier
1
service period
01/09/2004
to
02/09/2004

### ELECTRIC SERVICE CONTRACT

service address - ( 05 ) 120 Dean St B101 Taunton MA

| | |
|---|---|
| Energy Charges | 256.58 |
| Ppca( 3,535.0 KWH X 0.02400 ) | 84.84 |
| Pasny( 3,535.0 KWH X 0.00463- ) | -16.37 |
| **Total** | **325.05** |

| Month | Consumption (Kwh/Day) | Demand |
|---|---|---|
| Feb 03 | | |
| Mar 03 | | |
| Apr 03 | | |
| May 03 | | |
| Jun 03 | | |
| Jul 03 | | |
| Aug 03 | 29 | |
| Sep 03 | 27 | |
| Oct 03 | 46 | |
| Nov 03 | 64 | |
| Dec 03 | 72 | |
| Jan 04 | 110 | |
| Feb 04 | | |

| billing year | this year | last year |
|---|---|---|
| billing days | 32 | 0 |
| kWh use | 3,535.0 | 0.0 |
| kWh/Day | 110.5 | 0.0 |
| demand | 0.0 | 0.0 |

8000049853
8000049853

**TMLP**

Please return this portion with a check or money order made payable to

If address has changed, please check here and correct the information below.

20050376                    529.98



Meredith A Caldwell
22-2 Meadow Lane
Bridgewater MA 02324

Massachusetts Department of Public Health
State Laboratory Institute
Environmental Chemistry Laboratory
Inorganic Laboratory
305 South Street, Room 310
Jamaica Plain, Massachusetts 02130
(617) 983-6654, (617) 983-6655
Fax (617) 983-6662

60·17

## Analysis of _Lead_ in Drinking Water

**Submitter Information:**

Name: Meredith CALDWell

Street Address: 120 Dean St.
Apt. 101B

Town Taunton State MA

Zip 02780

Phone (508) 294 6642

If residing in an apartment, how many units are in your building _____

Date samples were collected by submitter 1/23/04

Date samples received in the laboratory 2/2/04

**Source Information:**

Private Well _____ Public Water Supply ✓

Address of Property if different _____

Location of Tap: Kitchen ✓ Bath _____

Floor: 1st ✓ 2nd _____ 3rd _____ other _____

Type of Home: Single _____ Multiple ✓

Condo _____

| Sample Identification | | Sample Number | Lead Concentration (ug/L) |
|---|---|---|---|
| First Draw Sample | 0 minutes | W- 4181 | 39.2 |
| Second Draw Sample | 2 minutes | W- 4182 | 1.66 |
| Third Draw Sample | 5 minutes | W- 4183 | 2.21 |

_Allowable Level:_ The EPA Action Level for lead in drinking water is 15 micrograms per liter (ug/L) for the first draw sample. (ug/L = parts per billion)

Chemist JG Date 2/6/04    Reviewer Ø    Date 2-6-04
Rev 1999    MW. Water worksheet

EXHIBIT
6

PATIENT NAME: Christoph, CAHaw11    DOB: 11-6-01

| | |
|---|---|
| 2/10/03  HPi Fou Flusu  Flusu  on  In G+  Chui 7(a —  G. Ruli | 12/16/03  state lead lab  Called pt's lead level  23 EP 46.  mom notified  of results and the  need for a venous lead  to be drawn.  mom booked  appt for venous lead — Ib first |
| 2/12/03  2 yr. PE  H+ 29¾  w+ 17-7  HC 48½ | |

Appetite — ... feed Enfa — 46 cal — stool ...
Sleep — Quiet — 9-4 day — wewaly
Stool — 2 reg/day     frequently
Rash/Illness
Meds  cetozem Q+ ADER — needed
Allergies  ... mixie, no liqure
Development  ...
HEENT  N
Heart  RSR ...
Lungs  clear
Abdomen  N+
Spine  ... ...
Genitals  ...
Skin  ...
Extremities  ... Conf
Neuro  + meubolu (
Assess  metabolical discas ? neuomuscuw
Plan  ...

**Anticipatory guidance (discussed if appropriate)**

Car Seat/seatbelt  ...    Helmet  NA
Smoking/Exposure  NO    Guns  NA
Back to Sleep  NA    Alcohol  NA
Smoke/CO detector  yes    Tobacco  NA
Fever in infant  ...    Drugs  NA
Sunscreen  ...    Sexual Activity  NA
DEET  ...    Suicidality  NA
PB Risk  NO    Poison Control  NA
Gates/No Walkers  NA    LMP  NA
PE/IMM UTD  N/A    Change in FAMILY Hx  NA
Change in SOCIAL Hx  ...

8½ 0  (13.5)
lead
G. Rull

| 12/18/03  bloodwork f |
|---|
| CO/HPI  needs nexous  Pb 2° ↑ Pb, drawn by  Pb (2)  of |
| Allergies & Meds  ...  ...  exposure, ... ... ... |
| PMH, Fam/Soc Hx |
| Wt/Temp |
| Gen  ABN ... |
| Skin |
| HEENT/Nodes |
| Resp  cle— |
| CV  RRR |
| ABD  soft  ~ |
| GU |
| MS |
| Neuro |
| Psych |
| Assessment/DX  ↑ Pb, need  venous level  difficut |
| Plan/Tests  acce ll.  ~1.5 ml  dr—  fr— |

EXHIBIT
D

PATIENT NAME: Christopher Caldwell   DOB: 11·10·01

12/22/03
    Call from state lead
Prog PD 24 EP 42
To offer family inspection
+ education. Will need
to start Fer in sol gtts
75mg (15mg Fe) / 0.6ml
Give 1.2 ml po GD, Disp
50 ml Fer. Left message
for parents to call back.
      M Burke RN CPW
Spoke c mom (MB)
1/9/04 - pt in for rescreen
lead blood draw. Mom spoke
c Dr. Hausman regarding
this visit. Advised to cont
Fe in F/U c blood draw
in 2 months 2° too soon.
Mom in agreement c
this recommendation. ——
        J. Hausman
        RN
3-2-04 Pc from Mom who states
Christopher had rare,
spontaneous BM. GI requested
fecal fat c stool cx. Order
OK'd by Dr. MN. Faxed to BH.
    L. D. Simione RN ——

## Laboratory Report

12/16/03

From:   Childhood Lead Screening Laboratory
        Massachusetts Department of Public Health
        305 South Street
        Jamaica Plain, MA 02130       617-983-6665


Provider #: 500801

To:     BULOTSKY, ALAN B., MD

        201 QUINCY ST
        BROCKTON, MA 02302

Name: CALDWELL, CHRISTOPHER     DOB:  11/06/01          Patient#:

Date Sample Taken:                12/12/03

Date Received by Lab:             12/15/03

Date Sample Tested:               12/15/03

Lab Identification #:             283311          *Needs venous
                                                   lead ASAP.*
Sample Type:                      Fingerstick

Blood Lead Concentration:         23 $\mu$g/dL

Zinc Protoporphyrin Concentration:    46$\mu$g/dL

### Interpretation of Pediatric Test Results:

Blood Lead Concentration:
    ($\mu$g/dL)

<10              Concentration levels in this range are below the threshold
                 of concern.

10-19            Concentrations in this range are above the threshold of
                 concern.  Initial elevations should be confirmed with
                 venous blood within 3 months.

$\geq$20         Children with levels in this range will be enrolled in
                 the Lead Program's case management system. Initial elevations
                 should be confirmed with venous blood in 1-3 weeks.
                 Levels $\geq$45 $\mu$g/dL should be confirmed as soon as possible.

ZPP Concentration:
    ($\mu$g/dL)

$\geq$35         Indicates impairment of the biosynthetic pathway.

1218:RL00026R  CALDWELL,CHRISTOPHER  30495888

PATIENT: CALDWELL,CHRISTOPHER      ACCT #: 30495888   LOC: ZLABOFF   U #:
589731
                        AGE/SX: 2Y 01M/M   ROOM:        REG: 12/18/03
REG DR: BULOTSKY,ALAN B        DOB:   11/06/01  BED:      DIS:
                    STATUS: REG REF    TLOC:


SPEC #: 1218:RL00026R   COLL: 12/18/03-0900   STATUS: COMP      REQ #:
02488427
            RECD: 12/18/03-1148   SUBM DR: BULOTSKY,ALAN B

ENTERED: 12/18/03-1148              OTHR DR:
ORDERED: LEAD PEDI

 Test              Result        Flag  Reference

 LEAD PEDI      |      |       |   |
 >  Pb          |      | 24     |   | ug/dL
               |
               |        INTERPRETATION OF BLOOD LEAD LEVELS
               |
               | < 10  BLOOD LEAD LEVELS IN THIS RANGE ARE BELOW THE
               | ug/dL  THRESHOLD OF CONCERN.  MASS. GENERAL LAWS REQUIRE
               |      PERIODIC SCREENING OF ALL CHILDREN LESS THAN 4 YEARS
               |      OF AGE.
               |
               | 10-19  BLOOD LEVELS IN THIS RANGE ARE ABOVE THE THRESHOLD OF
               | ug/dL  CONCERN.  INITIAL ELEVATIONS SHOULD BE CONFIRMED WITH

# DAILEY & ASSOCIATES
### ATTORNEYS AT LAW

RICHARD C. DAILEY
JOSEPH A. ENRIQUEZ
CANDICE J. McKENNA-IMLACH
JAMES F. ROGERS II
AMY L. HANSON

OF COUNSEL
CAROLYN D. ROSS

353 WEST CENTER STREET · P.O. BOX 517
WEST BRIDGEWATER, MASSACHUSETTS 02379-0517
TELEPHONE (508) 588-4800
FACSIMILE (508) 588-2067
http://www.daileylaw.com

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED
ARTICLE NUMBER: 7002 2410 0002 6376 5603

January 27, 2004

Dean Estates
5500 North Main Street
Fall River, MA 02720
Attn: Property Manager

RE:    NOTICE OF CANCELATION

To the Property Manager:

This office represents Mr. Benjamin Caldwell and Mrs. Meredith Caldwell; the tenants of 120 Dean Street, # 101B, Taunton Massachusetts, Thus any communications must be directed to this office.

Due to the Dean Estates' installation of an inadequate heating system and continued inability to repair this system, my clients are hereby canceling their lease. My clients' family has been without adequate heating for over one month. Dean Estates' continued failure to repair the heating system and provide heat constitutes a violation of Massachusetts General Laws, breach of quiet enjoyment and implied warranty of habitability.

As my clients alerted Dean Estates of this problem in November of 2003 and several times thereafter, Dean Estates has clearly been on notice of this problem. These problems have persisted for over a month. The management company has attempted to repair the heating system unsuccessfully on several occasions. At this time, there are still problems with the thermostat.

As you know, my client's son suffers from physical disabilities. Due to his disabilities, he suffers from a temperature regulation disorder. Inadequate heating can easily result in his becoming hypothermic.


EXHIBIT

MANZO & ASSOCIATES

In addition, you should be advised that any request that my clients sign a release from any and all claims relating to lead poisoning, an issue completely unrelated to the heating problem, amounts to an unfair and deceptive act pursuant to Massachusetts General Laws, Chapter 93A.

If you have any questions or concerns, please do not hesitate to call.

Very truly yours,

Rachel Manzo

cc:  Joel Davis
     clients



**&ASSOCIATES**
ATTORNEYS AT LAW

C. DAILEY
A. ENRIQUEZ
JOYCE J. McKENNA-IMLACH
JAMES F. ROGERS II
AMY L. HANSON

OF COUNSEL
CAROLYN D. ROSS

353 WEST CENTER STREET · P.O. BOX 517
WEST BRIDGEWATER, MASSACHUSETTS 02379-0517
TELEPHONE (508) 588-4800
FACSIMILE (508) 588-2067
http://www.daileylaw.com

March 9, 2004

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED
ARTICLE NO: 7001 1940 0004 3936 7396

Equity Residential Properties Management Corp.
2 North Riverside Plaza
Suite 400
Chicago, IL  60606
Attn: Joel R. Davis, Assistant Vice President – Legal

  *Re: Massachusetts General Laws Chapter 93A Demand Letter*
    *120 Dean Street, #101B, Taunton, MA*
    *Tenants: Benjamin & Meredith Caldwell*

Dear Mr. Davis:

  Please be advised that this office represents Mr. Benjamin Caldwell and Mrs. Meredith Caldwell with regard to their former tenancy with Equity Residential Properties Management Corp. ("Equity Residential" hereinafter). This letter is being sent pursuant to M.G.L. c. 93A due to Equity Residential's unfair and deceptive conduct, and M.G.L. c. 186, § 15B for Equity Residential's charge of an illegal fee prior to the commencement of my clients' tenancy.

  On or about August 14, 2003, the Caldwell executed a lease for the rental of a residential dwelling located at the aforementioned address. To secure their tenancy, a representative of Equity Residential's office located in Fall River, Massachusetts, informed the Caldwells that they had to pay the sum of Five Hundred Dollar ($500) in addition to first month's rent to "hold the apartment." They were further informed that Equity Residential would not rent the apartment unless they paid this fee. As the Caldwells believed this fee was a security deposit, and because they wished to rent the unit, they complied with this request. Their belief was reasonable, as the Lease Agreement contained a security deposit provision under paragraph 5. A copy of said Lease Agreement, marked "Exhibit 1," is attached hereto.

  Massachusetts law prohibits lessors from charging any fees other than first month's rent, last month's rent, security and key deposits. M.G.L. c. 186, § 15B provides in pertinent part:

    At or prior to the commencement of any tenancy, no lessor may require a tenant or prospective tenant to pay any amount in excess of the following:

    (i)  rent for the first full month of occupancy; and,



**DAILEY & ASSOCIATES**

      (ii)     rent for the last full month of occupancy calculated at the same rate as the first month; and,

      (iii)    a security deposit equal to the first month's rent . . . and,

      (iv)    the purchase and installation cost for a key and lock.

Id.

Upon information and belief, Equity Residential's actions were performed willfully and knowingly. You acknowledged during a telephone conversation, on February 18, 2004, that Equity Residential did in fact receive a Five Hundred Dollar ($500) payment from my clients, as such payment appears on the ledger. You also stated that this money was not a security deposit. See attached email marked "Exhibit 2." Furthermore, the Lease Agreement itself contains a "One-Time Fees" provision absent any explanation for charging such fees. See Exhibit 1, ¶ 6. Equity Residential, in its blatant disregard for Massachusetts law, clearly took advantage of my clients by charging this illegal fee.

You should be advised that Equity Residential's violation of M.G.L. c. 186, § 15B constitutes a violation of M.G.L. c. 93A, the Massachusetts Consumer Protection Act. Moreover, that the Lease Agreement contains a "One-Time Fees" provision is does not justify charging my clients the illegal fee. M.G.L. c. 186, § 15B(9) provides: "Any provision of a lease which conflicts with any provision of this section . . . shall be deemed against public policy and therefore unenforceable."

Equity Residential further violated Massachusetts law by its failure to provide adequate heat for my clients. During the month of November 2003, when the weather became cold, the Caldwell's noticed that their electric heating system was not working properly. They immediately contacted Equity Residential's Fall River office to notify the property manager of this problem. Furthermore, Mrs. Caldwell explained that having adequate heat was crucial, as the Caldwell's two-year old son, Christopher, suffers from a temperature regulation/stabilization disorder. Mrs. Caldwell specifically explained to the property manager that Christopher becomes hypothermic extremely easily.

From November 2003 through January 2004, Equity Residential made several unsuccessful attempts to repair the heating system. Although my clients called Equity Residential's Emergency Repair Service several times per week, on numerous occasions, the maintenance personnel failed to keep scheduled appointments. Frequently during this time, the temperature of my clients' unit was approximately fifty (50) degrees Fahrenheit.

During once such maintenance visit, the repairperson stated that Equity Residential had installed an improper heating element in the Caldwell's unit. Although the unit is a large two-bedroom apartment, Equity Residential installed a heating element designed for a small one-bedroom apartment. Due to Equity Residential's installation of an inadequate heating element, the Caldwell's were without adequate heating on a continuing basis from November 2003 through January 2004.

Although my clients were eventually provided with an electric radiator, the radiator proved grossly inadequate, and my clients remained extremely uncomfortable. Even more disturbingly, the Caldwell's were forced to confine their son to one room where the radiator was. Still that room remained cool. Mrs. Caldwell, on several occasions had to drive her son around in her car to prevent hypothermia.

2

# DAILEY & ASSOCIATES

At all material times, Equity Residential was on notice that Christopher Caldwell suffered from a temperature regulation disorder and that he could very easily become hypothermic. The constant stress of this possibility caused my clients severe emotional distress. Moreover, the problematic heating system and need for electric radiators caused my clients' electric bill to almost triple. Paragraph 7 of the Lease Agreement states that the Lessor may not do anything that will "substantially increase [the tenant's] utility bills." (See Exhibit 1, ¶ 7).

Massachusetts law requires that lessors provide heat to tenants. Failure to do so constitutes a breach of the implied warranty of habitability and the covenant of quiet enjoyment. In addition, Equity Residential's failure to correct the problem within a reasonable time amounts to unfair and deceptive conduct under M.G.L. c. 93A. Therefore, the Caldwell's demand the return of all rents paid for the months of November 2003 through January 2004 (Three Thousand Two Hundred Twenty-Five Dollars ($3,225).

Upon information and belief, Equity Residential acted willfully and knowingly at all times. As my clients contacted Equity Residential numerous times from November 2003 through January 2004 about the heating problems, Equity Residential cannot deny that they were on notice.

By law, lessors in Massachusetts are required to provide water to their tenants. As the water from the unit's tap is lead-contaminated, Equity Residential further violated Massachusetts law by its failure to provide water. My clients were unable to safely use the water for drinking or bathing their son.

After residing in the apartment for approximately six (6) months, my clients noticed that their two-year old son's disposition had changed dramatically. In December of 2003, during a check-up with his pediatrician, Christopher's blood was tested for lead. The results, which came back positive, revealed extremely high levels of lead poisoning. Christopher's pediatrician ordered that another test be administered on a different blood sample to assure that the results were reliable. The second test yielded identical results. Thereafter, Christopher's pediatrician contacted the Massachusetts Department of Public Health to request that a lead inspection be performed at the Caldwell's apartment. My clients notified Equity Residential immediately to inform them of these events via telephone and email. Copies of Christopher Caldwell's medical records are attached hereto and marked "Exhibit 3." It should be emphasized that Christopher was tested for lead prior to moving to 120 Dean Street, #101B, Taunton, Massachusetts. The test results were negative. Furthermore, no evidence suggests that the lead poisoning was due to another source.

A February 6, 2004 Analysis of Lead in Drinking Water, performed by the Massachusetts Department of Public Health, revealed that Caldwell's drinking water contained over double the legally allowable lead concentration. A copy of said Test Results, marked "Exhibit 4," are attached hereto. Equity Residential was immediately notified of the results by telephone and email. The results further revealed that it is not the public water supply that is contaminated, but rather the contamination occurred within the apartment complex's plumbing and/or piping connecting to the public water supply.

As my clients are concerned that other children reside in the Taunton apartment complex, they have requested that the Department of Public Health notify all tenants of this potentially hazardous condition. The Taunton Board of Health has also been made aware of the situation.

**DAILEY & ASSOCIATES**

Based on Equity Residential's numerous violations and disregard of Massachusetts law, including, but not limited to, its violations of M.G.L. c. 93A and M.G.L. c. 186, c. 15B, my clients hereby demand that Equity Residential return to my client all rents paid by them as well as the illegally charged fee. This amount is equal to Seven Thousand, One Hundred Sixty-Two Dollars and Fifty Cents ($7,162.50).

The measure of a tenant's damages for a landlord's breach of the implied warranty of habitability is the difference between the value of such apartment as warranted, and the rental value of the apartment in its defective condition. M.G.L. c. 11, §§ 127A-127F, 127K and 127L, c. 239, § 8A. My clients are reasonable in their position that the unit had no fair market value in its defective condition. Should Equity Residential fail to offer a good faith settlement in writing within thirty (30) days from its receipt of this demand letter, it may be held liable for treble damages plus costs and reasonable attorneys' fees.

My clients reserve any additional rights they may have under Massachusetts law, including Massachusetts lead poisoning laws.

If you have any questions or concerns, please do not hesitate to contact me. Your prompt attention to this matter is appreciated.

Very truly yours,

Rachel Manzo

Enclosures
Cc: clients

4

EXHIBIT 1



# STANDARD APARTMENT LEASE – TERMS AND CONDITIONS
## (MASSACHUSETTS FORM)

These Standard Apartment Lease – Terms and Conditions ("Terms and Conditions") are attached to and made a part of that certain Standard Apartment Lease - Term Sheet (the "Term Sheet") entered into by Lessor and Resident as of the Effective Date. These Terms and Conditions, the Term Sheet and any written agreements incorporated into the Term Sheet are collectively referred to as the "Lease." As used in this Lease, the term "Lessor" shall refer collectively to the entity identified as such on the Term Sheet, as agent for the owner of the Community, as well as the owner of the Community; the term "Resident" shall refer collectively to each of the resident(s) identified as such on the Term Sheet, jointly and severally; the term "Occupant" shall refer collectively to each of the occupant(s) identified as such on the Term Sheet; the term "Guests" shall refer collectively to any of Resident's or Occupant's guests, agents or other invitees; and the term "Effective Date" shall refer to the first day on which both parties have signed the Term Sheet on the Term Sheet, whichever is earlier. Unless otherwise defined above and herein, the capitalized terms used in these Terms and Conditions shall have the meaning set forth on the Term Sheet.

Lessor is pleased to rent to Resident, and each Resident agrees to rent from Lessor, the Premises located at the Community, subject to the provisions of the Lease. The "Premises" shall collectively refer to the Apartment located at the Community and identified on the Term Sheet (the "Apartment") as well as any other space(s) located at the Community and identified in the Monthly Rent provision of the Term Sheet or used exclusively by Resident, if any.

1.    **Lease Term:**  The Lease Term (both dates inclusive) is identified on the Term Sheet; provided, however, that if any space other than the Apartment is a separate item in the Monthly Rent provision of the Term Sheet, the period of time identified with that separate term shall be the Lease Term for such other space. The Lease Term shall also include any period of time prior to the Commencement Date of the Lease Term during which Lessor has granted Resident, and Resident has accepted, possession of the Premises.  At the end of such stated Lease Term, this Lease will automatically renew on a month-to-month basis unless and until Lessor or Resident gives the other party a Notice to Vacate as defined in and required by the Lease Term Expiration - Notice to Vacate/Renewal paragraph below or unless and until Lessor and Resident enter into a Lease renewal or another lease and the Lease Term shall include all such renewal periods.  If this Lease is properly terminated as provided herein, Resident agrees to surrender possession of the Premises in the same condition as at the commencement of the Lease Term, reasonable wear and tear excepted.

2.    **Rent:**  For any given month, the "Total Monthly Rent" is defined as the sum of all of the items identified as Monthly Rent on the Term Sheet for such month.  Total Monthly Rent (or that portion of a given month covered by the Lease Term) is due from Resident in advance and without demand on or before the first (1st) day of each month at the Community's on-site management office or at the location designated by Lessor (the "Management Office").  All of the Other Fees and Charges identified on the Term Sheet as well as any and all contractual fees and charges owed by Resident according to the terms of this Lease and applicable law shall be deemed "Additional Rent" and, if due from Resident according to the terms of this Lease, Additional Rent shall be due either on demand or as otherwise required by the Lease. Total Monthly Rent and Additional Rent shall be referred to collectively as "Rent." Rent shall be paid with a personal check (but not a third party personal check), cashier's check, certified check or money order in the exact amount due; but Lessor reserves the right to refuse payments of Rent or any or all of the Deposits identified on the Term Sheet in the form of a personal check at any time.  Rent payments must be made each month in one (1) lump sum even if there is more than one (1) Resident.  For Resident's as well as Lessor's protection, payments may not be made in cash.  If two (2) or more of Resident's personal checks are dishonored by the Institution from which the check is drawn, Resident will be required to pay Rent by cashier's check or money order.  Lessor is not required to redeposit a dishonored check.

3.    **Late Charges and NSF Fee:**  Resident acknowledges that late payment of Rent by Resident to Lessor will cause Lessor to incur costs not contemplated by this Lease. The exact amount of such costs being extremely difficult and impracticable to fix.  Such costs include, without limitation, the following:  lost use of funds to Lessor; charges that may be imposed on Lessor by reason of late payments owed on any obligation covering the Premises; costs incurred in connection with accounting for and attempting to collect late payments; outside collection agency expenses; and other administrative and accounting

costs related to late payments.  Therefore, if Rent is not paid on or before that day of the month identified in the Late Charge Terms on the Term Sheet, which date shall be not less than thirty (30) days subsequent to the date on which said payment was due as provided herein, late charges will be due from Resident in accordance with such Late Charge Terms.  In no event, however, shall such late charges exceed any maximum provided for by applicable law.  If Resident's check is dishonored by the institution from which the check is drawn, the NSF Fee identified on the Term Sheet will be due from Resident, and, in addition, the applicable late charges will be due from Resident if the dishonored check is not replaced in time to avoid such late charges.  The parties agree that these late charges represent a fair and reasonable estimate of the costs that Lessor will incur by reason of late payment of Rent by Resident.  Resident acknowledges that the terms of this late charges provision have been discussed and agreed to prior to the Resident's execution of this Lease.

4.    **Application and Acceptance of Payments:**  Payments received by Lessor from or on behalf of Resident shall be applied to Resident's account first to satisfy unpaid Additional Rent and non-rent obligations of Resident (in the order of priority determined by Lessor) and then to unpaid Total Monthly Rent, regardless of notations on checks or money orders and regardless of when the obligations arise.  Lessor is not obligated to accept unpaid Rent or any other unpaid amounts, except to the extent required to be accepted by law.  If Lessor accepts an amount less than the full amount due, Lessor in no way waives any of its rights and remedies under the Lease or otherwise for unpaid Rent or any other unpaid amounts.  To the extent permitted by law, Lessor may, but has no obligation to, terminate this Lease if Resident is chronically late with Rent payments.  Chronic late payment is defined as being served with a notice to quit for non-payment of rent on two (2) or more occasions in any twelve (12) month period    Lessor's acceptance of multiple late payments or Lessor's agreement to forgive a late fee or to otherwise insist upon strict compliance with the terms of this Lease or Lessor's delay in demanding strict compliance with this Lease shall not, consistent with the Waiver paragraph below, constitute a waiver.

5.    **Security Deposit:**  Before Resident may occupy the Premises, Resident must pay Lessor the Total Deposits identified on the Term Sheet.  These Total Deposits are not prepaid Rent, but are a good faith deposit for Resident's faithful fulfillment of each provision of this Lease as provided by applicable law and as a contingency against damages to the Premises or the Community caused by Resident, Occupant or any of their Guests.  The Total Deposits will be held by Lessor without liability for interest, unless otherwise required by law.  No portion of the Total Deposits may be applied by Resident to any Rent payment.  Resident's responsibility for damages under this Lease is not limited to the amount of the Total Deposits, and Lessor may use any and all of the rights and remedies provided to Lessor by law and in equity to recover any and all damages Lessor sustains.  Additional disclosures and information regarding the return of Total Deposits are contained in the Return of Security Deposit paragraph and the Additional State-Specific Requirements and Disclosures paragraph below.

© Equity Residential 2003. All Rights Reserved.                   National Lease Form (03/31/03)