6. **One-time Fees:** In addition to the Rent and the Deposits identified on the Term Sheet, Resident agrees to pay prior to moving into the Premises the Other Fees and Charges, if any, identified on the Term Sheet. Such fees are not refundable and in no way release Resident from the obligation of leaving the Premises in the condition required by this Lease.

7. **Utilities and Utility Cost Adjustments During Lease Term:** During the Lease Term, Lessor shall pay for those utilities identified and checked on the Term Sheet (subject to change as set forth below.) Resident shall pay for those utilities identified but not checked on the Term Sheet (subject to change as set forth below) as well as all other utilities not identified on the Term Sheet, if any, and all deposits, fees, charges and services on utility bills for utilities connected in Resident's name. Lessor reserves the right to select the utility company that will provide such utility services. Resident shall not allow utilities to be disconnected by any means (including nonpayment of bill) until the end of the Lease Term, at which time Resident shall obtain final utility bills and pay all outstanding charges for utility services up to and including the expiration of the Lease Term. Changes or installation of utility lines, meters, sub-metering or load management systems, and similar electrical equipment serving the Premises shall be the exclusive right of Lessor, provided such work does not substantially increase Resident's utility bills. Lessor reserves the right to install individual meters for measuring any or all utilities inside each apartment or to use any other method of measuring, estimating or allocating utility usage that Lessor reasonably deems to be appropriate to the extent permitted by applicable law. Should Lessor exercise this right, Lessor will notify Resident at least 30 days prior to commencement of such billing. If Lessor provides cable TV at the Community, the cable channels provided may be changed during the Lease Term if the change applies to all residents of the Community.

8. **Lease Application:** Resident will promptly notify Lessor in writing of any change in the information provided by Resident on Resident's lease application. If any information given by Resident in Resident's lease application is false, incomplete or misleading or if Resident fails to so notify Lessor of any such change, it shall be a default by Resident under this Lease, and Lessor may, at its option, immediately terminate this Lease.

9. **Delay in Delivery of Possession:** If Lessor does not deliver possession of the Premises on or before the Commencement Date of the Lease Term for any reason, Lessor shall not be liable for failure to deliver possession on that date, but that portion of Resident's Rent for the undelivered Premises payable under this Lease shall be abated on a per diem basis until Lessor delivers possession to Resident. If the Premises is not delivered to Resident within thirty (30) days from the date promised, either Resident or Lessor may thereafter terminate this Lease by written notice. If this Lease is not terminated, the Expiration Date of the Lease Term shall not be extended by reason of any delay in delivering possession of the Premises to Resident. Rent abatement or lease termination does not apply if delay is for cleaning or repairs that do not prevent Resident from occupying the Apartment or, for any undelivered Premises (other than the Apartment), if Lessor has offered to Resident substitute Premises of comparable location and quality at no additional cost to Resident.

10. **Failure to Pay Deposits, Other Fees and Charges and First Month's Rent:** Unless otherwise agreed to in writing by Lessor, if Resident fails to pay prior to occupying the Premises or on or before the Commencement Date of the Lease Term, whichever is earlier, an amount equal to the Total Deposits, the Other Fees and Charges, the Total Monthly Rent for the first full month of the Lease Term and, if the Lease Term commences on a day other than the first day of the month, that portion of the Total Monthly Rent due for the first partial month of the Lease Term, Resident shall be in default under this Lease. Lessor also may exercise any and all rights and remedies under this Lease, at law and in equity, including, without limitation, immediate termination of Resident's right of occupancy.

11. **Disclosure of Information:** If desired by Lessor or if requested of Lessor, Lessor may provide information on Resident or Occupant or on Resident's rental history to a third party for law-enforcement, governmental or Lessor's business purposes. If such information is requested by or on behalf of Resident, Lessor may charge Resident an administrative service fee for complying with such request.

12. **Right to Enter:** Subject to notice requirements imposed by applicable law, Resident consents to Lessor entering the Premises during reasonable hours for any inspections, maintenance, repairs and pest control procedures which Lessor deems necessary in its sole discretion and for delivering notices, to confirm compliance with this Lease, and for other purposes as provided by law. Subject to applicable law, Lessor also has the right to enter the Premises at any time in the event of an emergency or to abate a nuisance. If it is necessary to require Resident to temporarily vacate the Premises for the purpose of extermination of bugs or wood-infesting organisms or for any other reason, Resident agrees to do so upon at least seven (7) days notice, and Resident agrees not to hold Lessor liable for any of Resident's costs, expenses or inconvenience; provided, however, that Lessor shall abate the Total Monthly Rent for the period of time (if longer than one (1) day) during which Resident will be required to vacate the Premises.

13. **Responsibility for Guests/Invitees:** Resident shall be fully responsible for all acts and omissions of any Occupant, guest, invitee, or other person on the Premises or the Community with the permission of Resident, as if said acts or omissions were that of the Resident.

14. **Liens or Sales by Lessor:** This Lease is subject and subordinate to all present or future ground or underlying leases, mortgages or deeds of trust affecting the Premises and the Community and entered into by Lessor. Resident hereby appoints Lessor as attorney-in-fact to execute and deliver any and all necessary documents to evidence such subordination. Foreclosure of any mortgage or any sale under a deed of all or any portion of the Community shall not constitute a constructive eviction of Resident and Resident agrees to attorn to the purchaser at such foreclosure or sale as if this Lease was by and between Resident, as tenant, and such purchaser, as landlord. Upon any such foreclosure or sale, Lessor shall be released from all obligations hereunder accruing from and after the date of such foreclosure or sale and Resident shall look solely to the then owner of the Community for the performance of the duties of "Lessor" hereunder, including the return of the Total Deposits as long as Lessor has assigned such Total Deposits to such purchaser along with such other information as to the then owner of the Community as may be required by law.

15. **Security:** Resident acknowledges and agrees that protection against criminal action is not within Lessor's power, that Lessor does not provide (and does not have a duty to provide) any security protection services, security lighting or any other security measures at the Community, that Lessor has no obligation to conduct criminal background checks on actual or potential residents or occupants, that Resident shall look solely to the public police for security protection and that Resident and Occupant are responsible for their personal security. Lessor shall not be liable for failure to provide such security measures, for failure to conduct such criminal background checks or for criminal or wrongful actions by others against Resident, Occupant, Guests or others, including actions by others which cause damage to the property of Resident, Occupant or Guests.

16. **Patrol Services:** If, from time to time, Lessor provides patrol services at the Community (but Lessor has no obligation to provide such services), such patrol services are only for Lessor's own purposes and shall not constitute a waiver of, or in any manner modify, the security provision set forth above. Lessor shall not be liable for failure to provide patrol services and Lessor may decrease or discontinue such patrol services at any time, without notice to or consent of Resident.

17. **Limited Access Gates:** If Lessor has installed limited access gates at the Community (but Lessor has no obligation to install such gates), such gates are only for Lessor's own purposes and shall not constitute a waiver of, or in any manner modify, the security disclaimer set forth above. Resident agrees not to act in any way which may impair the use or function of such gates. Resident acknowledges and agrees that such gates are mechanical devices and can be rendered inoperative at any time and that Lessor shall not be liable for failed operations of the limited access gates. Lessor may remove such gates at any time, without notice to or consent of Resident.

# EXHIBIT 2

## Rachel Manzo

**From:** Rachel M Manzo [rmmanzo@daileylaw.com]
**Sent:** Tuesday, February 17, 2004 6:02 PM
**To:** 'Joel Davis'
**Subject:** RE: Dean Estates: Caldwell's

I think there has been some confusion as to what the $500 deposit was actually for. My clients apparently had to pay $500 to the management company to cover cleaning costs of the prior tenant.

-----Original Message-----
From: Joel Davis [mailto:JDavis@EQRWORLD.com]
Sent: Tuesday, February 17, 2004 3:23 PM
To: Rachel M Manzo
Subject: RE: Dean Estates: Caldwell's


Thank you Rachel.
I have confirmed that no security deposit was required (or tendered) when your clients moved-in. We have no deposit to return. The manager was not aware that your clients vacated the unit. We need the keys returned to the management office as soon as possible since the tenancy is now over.
Thank you.

-----Original Message-----
From: Rachel M Manzo [mailto:rmmanzo@daileylaw.com]
Sent: Tuesday, February 17, 2004 2:35 PM
To: 'Joel Davis'
Subject: RE: Dean Estates: Caldwell's


Hi Joel,
The Taunton Board of Health has been contacted regarding this problem. Meredith Caldwell has been in touch with someone there named Mr. Gardner--he will be willing to speak with you regarding the management company's reponsibilities. The number is 508 821-1400.
-Rachel

-----Original Message-----
From: Joel Davis [mailto:JDavis@EQRWORLD.com]
Sent: Saturday, February 14, 2004 12:57 PM
To: Rachel M Manzo
Subject: RE: Dean Estates: Caldwell's


I have always been your contact person. My initial correspondence to your office requested that be the case.
Please call me Monday to discuss.

> -----Original Message-----
> From: Rachel M Manzo [mailto:rmmanzo@daileylaw.com]
> Sent: Fri 2/13/2004 3:59 PM
> To: JDavis@EQRWORLD.com
> Cc:
> Subject: Dean Estates: Caldwell's
>
>
> Dear Joel,
> I wanted to touch base about a couple of different issues. First of all, I have received no response to the Ben and Meredith Caldwell's notice of cancellation. They have moved out of the apartment at this time. As you know, the cancellation was based on the installation of an inadequate heating element which resulted in ongoing problems. As they were packing,

1

however, they received notice of high lead concentations in their drinking water. The Massachusetts Department of Public Health's test results reveal that the tap water lead concentration is significantly higher than the permited limits.

As my clients' decision to cancel the lease is justified under Massachusetts Law, I would expect that they receive their security deposit in a timely manner.

Also, I would like to have only one contact person from now on, as the property manager of Dean Estates in Fall River has been very difficult to contact. Please contact me at your earliest convenience to discuss this matter.

Thank you.

Very truly yours,
Rachel Manzo

2

PATIENT NAME: Christopher CAHarell    DOB: 11-6-01

| | |
|---|---|
| /03 Here for Flu vac. Fluvax 0.25 In GL [illegible] — [signature] A Bull | 12/16/03 state lead lab called pt's lead level 23 EP 46. Mom notified of results and the need for a venous lead to be drawn. Mom booked appt for venous lead — [signature] |
| 12/0/03 2 yr. P.E 29¾ wt 17-7 HC 48¼ title-feed [illegible] — 46 cal — stool mvt petite sleep — [illegible] — q4day — [illegible] 2 [illegible]/day frequent sh/Illness ds [illegible] allergies cefazone & ADER — neocat development [illegible] no [illegible] ENT n[l] Heart RSR nl Lungs clear Abdomen nl [illegible] Genitals ♂ Extremities L congenital [illegible] Assess Mitochondrial disease? neuromuscular [illegible] | 12/18/03 bloodwork ✓ CC/HPI needs venous Pb 2° ↑ Pb, drawn by (Pb of 2) of Allergies & Meds [illegible] ROS/Imms exposure, possible & Low PMH, Fam/Soc Hx Wt/Temp Gen A&W p distress ✓ Skin HEENT/Nodes Resp clear CV RRR ABD soft GU MS Neuro Psych Assessment/DX ↑ Pb. need venous level — discuss Plan/Tests access [illegible] drawn from ® [illegible] |

Anticipatory guidance (discussed if appropriate)
Seat/seatbelt [✓]    Helmet N/A
Smoking/Exposure NO    Guns N/A
Back to Sleep N/A    Alcohol N/A
Smoke/CO detector yes    Tobacco N/A
[illegible] in infant yes    Drugs N/A
screen [✓]    Sexual Activity N/A
ET [✓]    Suicidality N/A
Risk [✓]    Poison Control ✓
Yes/No Walkers N/E
IMMUTD N/A    Change in FAMILY Hx ✓
Change in SOCIAL Hx N/A

lead
[signature] A Bull

PATIENT NAME: Christopher Caldwell    DOB: 11·6·01

2/22/03
Call from state lead
Prog PD 24 EP 42
To offer family inspection
+ education. Will need
to start Fer in sol gtts
15 mg (15mg Fe)/0.6 ml
Give 1.2 ml po QD, Disp.
50 ml ~~Fe~~ Left message
for parents to call back.
         M Buker RN CPNP
Spoke c̄ mom (MB)

9/04 - pt in for venous
ed blood draw. Mom spoke
Dr. Hauseman regarding
is visit. Advised to cont
c̄ in F/U c̄ blood draw
2 months 2° too soon.
Mom in agreement c̄
his recommendation. —
         — J. hacier

2-04 PC from mom who states
istopher had have
itaneous BM. GI requested
cal fat & stool CX. Order
d by Dr. MH. & faxed to BH.
   — L. DiSimone RN —

\*\*   CONFIDENTIAL   \*\*\*

Laboratory Report

ɔm: Childhood Lead Screening Laboratory                                    12/16/03
    Massachusetts Department of Public Health
    305 South Street
    Jamaica Plain, MA 02130        617-983-6665


BULOTSKY, ALAN B., MD                          Provider #: 500801

201 QUINCY ST
BROCKTON, MA 02302


e: CALDWELL, CHRISTOPHER        DOB:   11/06/01            Patient#:

ɛ Sample Taken:                        12/12/03

ɛ Received by Lab:                     12/15/03

ɛ Sample Tested:                       12/15/03

 Identification #:                     283311

ɔle Type:                              Fingerstick          *Needs venous lead ASAP.*

ɔd Lead Concentration:                 23 µg/dL

: Protoporphyrin Concentration:        46 µg/dL

Interpretation of Pediatric Test Results:

ɔd Lead Concentration:
 (µg/dL)

        Concentration levels in this range are below the threshold
        of concern.

9       Concentrations in this range are above the threshold of
        concern. Initial elevations should be confirmed with
        venous blood within 3 months.

        Children with levels in this range will be enrolled in
        the Lead Program's case management system. Initial elevations
        should be confirmed with venous blood in 1-3 weeks.
Concentration:   Levels ≥45 µg/dL should be confirmed as soon as possible.
 µg/dL)

        Indicates impairment of the biosynthetic pathway.

1218:RL00026R   CALDWELL,CHRISTOPHER   30495888

PATIENT: CALDWELL,CHRISTOPHER         ACCT #: 30495888   LOC: ZLABOFF   U #: 589731
                AGE/SX: 2Y 01M/M    ROOM:          REG: 12/18/03
REG DR: BULOTSKY,ALAN B         DOB: 11/06/01   BED:        DIS:
                STATUS: REG REF    TLOC:

SPEC #: 1218:RL00026R   COLL: 12/18/03-0900   STATUS: COMP        REQ #:
02488427
           RECD: 12/18/03-1148   SUBM DR: BULOTSKY,ALAN B

ENTERED: 12/18/03-1148
ORDERED: LEAD PEDI                   OTHR DR:

Test              Result       Flag   Reference

LEAD PEDI
> Pb                24                ug/dL

    INTERPRETATION OF BLOOD LEAD LEVELS

    < 10   BLOOD LEAD LEVELS IN THIS RANGE ARE BELOW THE
    ug/dL  THRESHOLD OF CONCERN. MASS. GENERAL LAWS REQUIRE
           PERIODIC SCREENING OF ALL CHILDREN LESS THAN 4 YEARS
           OF AGE.

    10-19  BLOOD LEVELS IN THIS RANGE ARE ABOVE THE THRESHOLD OF
    ug/dL  CONCERN. INITIAL ELEVATIONS SHOULD BE CONFIRMED WITH

EXHIBIT 4

Case 1:04-cv-11950-MBB  Document 1-3  Filed 09/08/2004  Page 9 of 10

Massachusetts Department of Public Health
State Laboratory Institute
Environmental Chemistry Laboratory
Inorganic Laboratory
305 South Street, Room 310
Jamaica Plain, Massachusetts 02130
(617) 983-6654, (617) 983-6655
Fax (617) 983-6662

6047

## Analysis of Lead in Drinking Water

**Submitter Information:**

Name: Meredith Caldwell

Street Address: 120 Dean St.
Apt. 101B

Town: Taunton  State: MA

Zip: 02780

Phone: (508) 294 6642

**Source Information:**

Private Well ____   Public Water Supply ✓

Address of Property if different ____

Location of Tap: Kitchen ✓   Bath ____

Floor: 1st ✓   2nd ____   3rd ____   other ____

Type of Home: Single ____   Multiple ✓

Condo ____   Other ____

If residing in an apartment, how many units are in your building ____

Date samples were collected by submitter: 1/23/04

Date samples received in the laboratory: 2/2/04

| Sample Identification | Sample Number | Lead Concentration (ug/L) |
|---|---|---|
| First Draw Sample   0 minutes | W- 4181 | 39.2 |
| Second Draw Sample  2 minutes | W- 4182 | 1.66 |
| Third Draw Sample   5 minutes | W- 4183 | 2.21 |

Allowable Level: The EPA Action Level for lead in drinking water is 15 micrograms per liter (ug/L) for the first draw sample. (ug/L = parts per billion)

Chemist: JG   Date: 2/6/04   Reviewer: ____   Date: 2-6-04

y 1999   MW. Water worksheet